# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

M2 SOFTWARE, INC., a Delaware
corporation,
　　　　　*Plaintiff-Appellant,*

　　　　　v.

MADACY ENTERTAINMENT, a
corporation e/s/a Madacy
Entertainment Group, Inc.;
HANDLEMAN COMPANY, a
corporation; SFX ENTERTAINMENT,
a corporation,
　　　　　*Defendants-Appellees.*

No. 03-55957

D.C. No.
CV-00-02853-AHM

OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
February 7, 2005—Pasadena, California

Filed August 31, 2005

Before: Harry Pregerson, William C. Canby, Jr., and
Robert R. Beezer, Circuit Judges.

Opinion by Judge Pregerson

11893

**COUNSEL**

Mark L. Pettinari, San Francisco, California (argued), and Toula Arvanitis-Dalpe, Anahem Hills, California (brief), for the plaintiff-appellant.

Robert H. Rotstein, McDermott, Will & Emery, Los Angeles, California, for the defendants-appellees.

---

**OPINION**

PREGERSON, Circuit Judge:

## I.  OVERVIEW

Plaintiff-Appellant M2 Software, Inc. ("M2 Software") is the owner of **M2**, a federally registered trademark that is used in conjunction with business management and interactive media application goods and services for the film and music industry. Defendants-Appellees Madacy Entertainment, Handleman Company, and SFX Entertainment (collectively, "Madacy") began using **M2 Entertainment** as a trademark for their new record label venture. Following failed licensing negotiations between the parties, M2 Software filed suit against Madacy in early 2000. A week after M2 Software filed its suit against Madacy, Madacy began phasing out the use of its **M2 Entertainment** mark.

M2 Software argued that Madacy's use of the **M2 Entertainment** mark infringed M2 Software's **M2** trademark and would cause a likelihood of confusion. Specifically, M2 Software's complaint alleged Madacy had committed: (1) federal trademark infringement, false designation and description of origin, and trademark dilution; (2) state trademark dilution, injury to business reputation, and unfair trade practices; and (3) common law trademark infringement, passing off, and unfair competition.

On January 8, 2002, the district court granted partial summary judgment in favor of Madacy. The district court ruled that no rational trier of fact could find a likelihood of forward confusion among either general consumers or music industry members or a likelihood of reverse confusion among music industry members.

A jury trial commenced on May 13, 2003. The only issue that went to the jury was whether there was a likelihood of reverse confusion among general consumers, i.e., consumers who were not members of the music industry. In other words, the jury was asked to decide whether general consumers would mistakenly believe that they were purchasing Madacy's products when in fact, they were purchasing M2 Software's products.

Three days later, the jury returned a verdict in favor of Madacy, finding that it was not liable for reverse trademark confusion among general consumers. The district court entered judgment in favor of Madacy.

M2 Software timely filed its Amended Notice of Appeal. It now challenges: (1) the district court's grant of partial summary judgment in favor of Madacy; (2) the district court's denial of M2 Software's motion for reconsideration of partial summary judgment; (3) the district court's entry of judgment as a matter of law for SFX Entertainment; (4) the district court's evidentiary rulings on motions in limine; (5) the district court's jury instructions and special verdict form; and (6) the district court's decision to bifurcate the trial by first presenting the liability claim to the jury. M2 Software also asks for attorneys' fees under the Lanham Act. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II.   FACTS AND PROCEDURAL HISTORY

In 1991, Metabolic Music, Inc., adopted **M2** as a brand and trade name. Metabolic Music later amended its corporate

name to M2 Software, Inc. On August 30, 1994, Metabolic Music submitted a trademark application to the United States Patent and Trademark Office ("USPTO") for federal registration of its **M2** word mark. Approximately fourteen months later, the USPTO granted Registration Number 1,931,182 for the **M2** trademark and entered the mark on the Principal Register. The **M2** mark is now deemed incontestable by the USPTO pursuant to 15 U.S.C. § 1065.[1]

M2 Software's trademark application stated that the M2 mark would be used in conjunction with:

> computer software featuring business management applications for the film and music industries; and interactive multimedia applications for entertainment, education and information, in the nature of artists' performances and biographical information from the film and music industries; and instructions and information playing musical instruments.

M2 Software primarily developed and licensed database software used for processing and managing data of major record companies' musical works. M2 Software's two database programs are called the "Record Label Management System" ("RLMS") and the "Music Publisher Management System" ("MPMS").[2] M2 Software licensed these databases to several record companies.

---

[1] If the registered trademark-holder satisfies additional conditions, including continuous use of the registered mark for five consecutive years, absent certain listed exceptions, the registration of the mark becomes "incontestable." 15 U.S.C. § 1065. Once a mark is deemed "incontestable," the trademark-holder is entitled to an exclusive right to use the mark that can be defeated only on specifically enumerated grounds. *Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 711-12 (9th Cir. 1974).

[2] The RLMS system is a software database system that contains music-related information about songs, albums, artists, and music publishers. M2 Software sells the RLMS only to record companies, and not to the general public. The MPMS is a similar database for use by music publishers.

Using these database programs, M2 Software also provided music content administration services. These administration services include: (1) processing of record labels' album catalogs, song catalogs, artist and band rosters, and sales information; (2) briefing of recording artist and producer contracts; and (3) generating royalty statements and reports.

In addition to providing database products and music content administration services to major record companies, a small portion of M2 Software is devoted to music production. Particularly, M2 Software sells a small line of interactive music on CD-ROM, floppy media, and audio-only CDs. These interactive music products bear the M2, **M2 Interactive**, or **M2 Music** marks and are offered for sale on M2 Software's internet website and at the website "Amazon.com."

Madacy, the alleged infringer, is a recording and distribution company that specializes in low-price collections of recorded music. Generally, Madacy licenses the music it distributes from other companies, such as BMG Music.

In 1999, Madacy created a new division named M2 Entertainment. The new division would use **M2 Entertainment** as the trademark for its full-priced CDs featuring a line of sports-related music tied to local professional sports teams. Madacy filed an "intent-to-use" trademark application with the USPTO for its **M2 Entertainment** mark in August 1999.[3]

On December 30, 1999, M2 Software sent cease and desist letters to Madacy's chief executive officer and to SFX Entertainment's chairman, demanding that the companies stop using M2 Software's senior and federally registered M2 trade-

---

[3]The trademark application stated that the M2 Entertainment mark was to be used in connection with "sound recording featuring music, namely phonographic records, audio tapes, and compact discs featuring music; and entertainment services, namely the marketing, production and distribution of phonographic records, audio tapes, and compact discs."

mark.[4] Following receipt of these letters, a representative from Madacy approached M2 Software with an offer to enter a licensing agreement for the **M2** trademark.

While licensing negotiations were underway between Madacy and M2 Software, Madacy ran a multi-page advertising supplement in the February 28, 2000, edition of Billboard magazine. The supplement promoted Madacy's twentieth anniversary, and the launch of Madacy's new **M2 Entertainment** branded record label venture. A full-page of the supplement was devoted to an ad bearing Madacy's **M2 Entertainment** logo.

As a result of this multi-page advertising supplement, M2 Software commenced the present suit against Madacy on March 21, 2000. Nearly a week later, Madacy began phasing out its **M2 Entertainment** mark.

In its suit against Madacy, M2 Software alleged that Madacy's use of the **M2 Entertainment** mark infringed M2 Software's federally registered **M2** trademark and would cause a likelihood of confusion. Specifically, M2 Software claimed in its complaint that by using the **M2 Entertainment** mark, Madacy had committed: (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) false designation and description of origin in violation of 15 U.S.C. § 1125(a); (3) trademark dilution in violation of 15 U.S.C. § 1125(c); (4) state trademark dilution and injury to business reputation in violation of California Business and Professions Code section 14330; (5) state unfair trade practices in violation of California Business and Professions Code section 17200; and (6) common law trademark infringement, passing off, and unfair competition.

---

[4]"The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

The case was assigned to Judge Lourdes Baird in the Central District of California. On January 8, 2002, Judge Baird granted partial summary judgment in favor of Madacy. Judge Baird ruled that there was no triable issue of likelihood of forward confusion among general consumers and music industry members, or of likelihood of reverse confusion among music industry members. The district court's ruling was based, in part, on *M2 Software, Inc. v. Viacom, Inc.*, 119 F. Supp. 2d 1061 (C.D. Cal. 2000).

Approximately three weeks after the district court granted partial summary judgment against M2 Software, we reversed the *Viacom* decision by a memorandum disposition. *See M2 Software, Inc. v. Viacom, Inc.*, 2002 WL 123571 (9th Cir. Jan. 30, 2002) (mem.). Following our remand of *Viacom* on May 14, 2002, the case was randomly reassigned to Judge A. Howard Matz. Because both the current case and the *Viacom* case involved the alleged infringement of the **M2** mark, the current case was reassigned from Judge Baird to Judge Matz on May 29, 2002.

Nearly a year before the jury trial commenced, M2 Software filed with Judge Matz a motion for reconsideration of Judge Baird's January 8, 2002, partial summary judgment order. The basis of M2 Software's motion for reconsideration was that the Ninth Circuit's unpublished memorandum disposition in *Viacom* constituted new law that warranted reversal of Judge Baird's order. Judge Matz ruled that *Viacom* was not an intervening change in Ninth Circuit law and denied M2 Software's motion for reconsideration on July 29, 2002.

Judge Matz later ruled on numerous motions in limine, and a jury trial commenced on May 13, 2003. The trial was restricted to the remaining issue of reverse confusion: whether general consumers who were not music industry members would mistakenly believe that they were purchasing Madacy's products while in fact they were purchasing M2 Software's products.

Before the case was submitted to the jury, SFX Entertainment (one of Madacy's co-defendants) moved for judgment as a matter of law, arguing that SFX Entertainment was not directly involved with the alleged trademark infringement. The district court agreed and granted SFX Entertainment judgment as a matter of law on May 15, 2003.

A day later, the jury returned a special verdict finding Madacy not liable. The district court entered judgment against M2 Software on May 30, 2003, and M2 Software timely filed its Amended Notice of Appeal on June 2, 2003.

## III.   ANALYSIS

M2 Software now appeals: (1) the district court's grant of partial summary judgment in favor of Madacy; (2) the district court's denial of M2 Software's motion for reconsideration of partial summary judgment; (3) the district court's entry of judgment as a matter of law for SFX Entertainment; (4) the district court's evidentiary rulings on certain motions in limine; (5) the district court's decision to bifurcate the trial; and (6) the district court's jury instructions and special verdict form. Furthermore, M2 Software seeks attorneys' fees under the Lanham Act, 15 U.S.C. § 1117. As discussed below, we affirm because the district court did not err in determining there was no likelihood of confusion between the marks. In addition, the district court acted within its discretion in managing the trial and any errors were harmless.

### A.   The District Court's Grant of Partial Summary Judgment

**[1]** This case deals with "two distinct claims in the trademark infringement context: forward confusion and reverse confusion." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005). Forward confusion occurs when consumers mistakenly associate a junior user's mark with that of a "well-known senior mark." *Dreamwerks Prod.*

*Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n.5 (9th Cir. 1998). Reverse confusion cases, however, involve consumers dealing with a senior trademark-holder believing all the while that they are doing business with a junior user. *See Surfvivor Media, Inc.*, 406 F.3d at 630.

**[2]** Both reverse and forward confusion cases require the plaintiff to demonstrate a likelihood of confusion among consumers. Therefore, to survive summary judgment on its forward confusion claim in this case, M2 Software must raise a material question of fact whether the general public and the music industry members thought that M2 Software was the source of Madacy's CDs. Furthermore, to withstand summary judgment on its reverse confusion claim, M2 Software must demonstrate that a question of material fact remains whether music industry members believed that Madacy was the source of M2 Software's goods.

**[3]** The test of trademark infringement under state, federal, and common law is whether there will be a likelihood of confusion.[5] *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994). To determine whether there is a likelihood of confusion between the parties' allegedly related goods and services, we consider the following eight *Sleekcraft* factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

---

[5]Furthermore, for M2 Software to succeed on each of its other federal, state, and common-law based claims, it must establish a likelihood of confusion. *See Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) ("The test for false designation under the Lanham Act, as well as the common-law and statutory unfair competition claims, is whether there was a 'likelihood of confusion.' ").

Some *Sleekcraft* factors "are much more important than others, and the relative importance of each individual factor will be case specific." *Brookfield*, 174 F.3d at 1054. In essence, "[t]he test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1129.

The district court did not analyze each *Sleekcraft* factor separately. Instead, the district court discussed each factor "in the context of the facts that are marshaled by each side." The district court granted partial summary judgment in favor of Madacy. The court ruled as a matter of law (1) that there was no likelihood of forward confusion among either general consumers or music industry members, and (2) that there was no likelihood of reverse confusion among music industry members.

We review summary judgments *de novo. See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). As we now explain, an analysis of the *Sleekcraft* factors supports the conclusion of the district court that there was no triable issue of the likelihood of confusion.

#### i.   Strength of Mark

Trademarks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). A generic mark is the least distinctive, and an arbitrary or fanciful mark is the most distinctive. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). The more distinctive a mark, the greater its conceptual strength; in other words, a mark's conceptual strength is proportional to the mark's distinctiveness.

In analyzing the first *Sleekcraft* factor, the district court was presented with evidence that M2 Software first used the **M2**

mark in commerce in January 1992, registered the mark with the USPTO in 1994, and devoted resources to maintaining the mark. And up to late 1999, M2 Software had scant sales of its CD products and devoted a meager investment of $14,500 in direct advertising for these products.

The district court, when it conducted its *Sleekcraft* analysis, relied heavily on M2 Software's scant sales of, at most, 215 CDs, and its meager advertising expenditures for its CD products. On the basis of M2 Software's scant sales and meager advertising expenditures, the court concluded that even though the fanciful **M2** mark was conceptually strong, no reasonable trier of fact could find for M2 Software on the issue of likelihood of forward confusion as to the general public. M2 Software argues that, by considering its scant sales and meager advertising expenditures, the district court erroneously required that M2 Software's fanciful mark acquire a secondary meaning. We disagree.

**[4]** A mark's overall strength is relative and cannot be determined by mechanistically assessing its conceptual or commercial strengths. Our court has previously recognized that a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success. *See, e.g., Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (recognizing that an otherwise inherently weak mark "may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition" (citation and internal quotation marks omitted)); *GoTo.com*, 202 F.3d at 1208 (stating that GoTo's "tremendous success" strengthened its otherwise suggestive mark); *Brookfield*, 174 F.3d at 1058 (noting that "placement within the conceptual distinctiveness spectrum is not the only determinant of a mark's strength, as advertising expenditures can transform a suggestive mark into a strong mark where, for example, that mark has achieved actual marketplace recognition" (internal citation omitted)); *Sleekcraft*, 599 F.2d at 350 (stating that a suggestive mark may be strengthened by adver-

tising; otherwise the weak mark is "entitled to a restricted range of protection"). But we have never held that an arbitrary or fanciful mark (i.e., a conceptually strong mark) can have its overall strength diminished by feeble commercial success. We decline to do so today. Rather, we hold that a lack of commercial strength cannot diminish the overall strength of a conceptually strong mark so as to render it undeserving of protection. Otherwise, a mark which is conceptually strong may never have the opportunity to blossom into its full commercial potential through effective marketing.

**[5]** That being said, we conclude that the first *Sleekcraft* factor weighs in M2 Software's favor, and that the district court properly considered the overall strength of the **M2** mark. Indeed, the district court acknowledged that M2 Software's **M2** mark was fanciful, federally-registered, and incontestable.[6] The district court then weighed the remaining *Sleekcraft* factors based on the overall strength of the M2 mark, and the court focused on the ultimate question posed by the *Sleekcraft* analysis: the likelihood of confusion as to the source of the product.

### ii.   Proximity of Goods

**[6]** When dealing with the second *Sleekcraft* factor, the courts assess whether the goods are related or complementary. *Sleekcraft*, 599 F.2d at 350. Where the goods are related or complementary, the danger of confusion is heightened. *See id.* It is undisputed that M2 Software distributes a line of products that includes audio CDs and has a website that provides audio content for downloading. At a minimum, both M2 Software and Madacy distributed music and CDs. Therefore this *Sleekcraft* factor weighs in M2 Software's favor, but only

---

[6]"[The] burden of proving likelihood of confusion (that is, infringement) [remains] on the party charging infringement even when relying on an incontestable registration." *KP Permanent Make-Up, Inc., v. Lasting Impression I, Inc.*, 125 S. Ct. 542, 548 (2004).

slightly because the genres of the music CDs are very significantly different.[7] *See Sleekcraft*, 599 F.2d at 350 (noting that goods are proximate if "the goods are similar in use and function"). Thus, the district court did not err in ruling that this factor, "if it can support plaintiff's case at all, does so very slightly."

### iii.    Similarity of Marks

The similarity of marks "has always been considered a critical question in the likelihood-of-confusion analysis." *See GoTo.com*, 202 F.3d at 1205. Similarity of marks is assessed "in terms of their sight, sound, and meaning." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (citations omitted). Moreover, the trademark is not judged by an examination of its parts, but rather "the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *Id.*

M2 Software stresses that Madacy's **M2 Entertainment** mark was identical to its **M2** mark in both sight and sound. Madacy, on the other hand, argues that the two marks are not sufficiently similar because the "M2" in Madacy's **M2 Entertainment** mark is highly stylized and conjoined with the "Entertainment," lacks the oval which appears around M2 Software's **M2** mark, and is used in connection with other more distinctive marks like the **Lakers** or the **NBA**.

**[7]** The district court compared the marks and took into account the similarity of the sight, sound, and meaning of the two marks. After considering (1) the addition of "Entertainment" by Madacy, (2) the use of the mark "interactive" in addition to **M2** on M2 Software's CDs, (3) the use of other marks in addition to **M2 Entertainment** on Madacy's CDs,

---

[7]M2 Software distributed acid jazz music while Madacy distributed sports-related music.

and (4) the fanciful nature of M2 Software's **M2** mark, the district court ruled that the third *Sleekcraft* factor weighed only very slightly in M2 Software's favor. This ruling was not erroneous. The district court considered the marks "in their entirety and as they appear[ed] in the marketplace." *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980); *see also Lindy Pen Co. Inc. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) ("The two marks viewed in isolation are indeed identical, but their similarity must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the [products].").

### iv.   Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. As evidence of actual confusion, M2 Software attempted to offer a likelihood of confusion survey in its opposition to Madacy's summary judgment motion. The district court, as discussed below, properly excluded M2 Software's survey.

M2 Software now attempts to offer evidence of actual confusion among one of its previous customers allegedly caused by Madacy's use of the **M2** mark. Specifically, M2 Software contends that Ms. Patricia Weymss, a record label executive formerly employed by an M2 Software licensee, informed M2 Software that she saw an ad in which Madacy was using the **M2 Entertainment** mark.

In the lower court proceedings, however, M2 Software did not discuss Ms. Weymss's deposition testimony. The deposition transcripts were merely attached as an exhibit to Madacy's summary judgment motion and as an exhibit to a declaration filed by M2 Software in opposition to Madacy's summary judgment motion. In its opposition to Madacy's summary judgment motion, M2 Software failed to raise the

issue or argue that Ms. Weymss was confused by Madacy's use of the **M2 Entertainment** mark. Thus, M2 Software cannot offer this evidence on appeal. *See Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 482 (9th Cir. 1988) (stating that only those items referred to in parties' partial summary judgment memoranda in trial court could be considered on appeal and that the panel's analysis was limited to the factual assertions raised in the district court papers).

**[8]** Even if we consider Ms. Weymss's testimony, the evidence fails to show actual confusion.[8] *See Sleekcraft*, 599 F.2d at 352 (noting that "courts have often discounted such evidence because it was unclear or insubstantial"). At best, the evidence demonstrates that Ms. Weymss was *reminded* of M2 Software when she saw Madacy's advertisement bearing the M2 Entertainment mark. For example, Ms. Weymss testified: "I saw the advertisement. I saw M2. I remembered [M2 Software's President]. I hadn't spoken to him in months. I said, oh, I should give him a call and say hi." Absent additional evidence, Ms. Weymss's testimony was not enough to demonstrate actual confusion. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 843 n.7 (9th Cir. 2002) (noting that "while enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion." (citation omitted)). Therefore, the fourth *Sleekcraft* factor weighs in Madacy's favor.

### v.   Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987). The district court ruled that the fifth *Sleekcraft* factor weighed, at best, only very slightly in M2 Software's favor. The district court determined that there was no significant overlap in advertising markets. The court concluded that the only overlap between Madacy's and M2

---

[8]Accordingly, Madacy's tedious motion to strike is denied as moot.

Software's goods occurred on the website "Amazon.com," where the music CDs of both companies could potentially have been purchased.

M2 Software takes issue with the district court's conclusion and argues that Madacy uses the same marketing channels because Madacy also launched its **M2 Entertainment** branded record label during a music industry trade show; because both M2 Software's **M2** mark and Madacy's **M2 Entertainment** mark had been advertised in similar magazines; and because both M2 Software and Madacy had established a music industry presence in Los Angeles, New York, Miami, and Nashville. M2 Software, however, fails to discuss important distinctions in the marketing channels used. M2 Software promoted its **M2** products in specialty music industry publications, whereas Madacy did not promote its **M2 Entertainment** CDs in these publications. Furthermore, M2 Software argues that both marks were launched at the same trade show. However, even though Madacy launched its **M2 Entertainment** record label at the same trade show, it did so nearly a decade *after* M2 Software launched its **M2** products.

**[9]** Next, even though both M2 Software and Madacy offered their CDs for sale over the internet in general, and on "Amazon.com" in particular, M2 Software failed to provide evidence of sales attributable to M2 Software's website. Finally, unlike Madacy's music albums, M2 Software's products were not sold in retail outlets. In light of these differences, we conclude that the district court erred, although harmlessly, in ruling that this factor slightly favored M2 Software. Our weighing of the factor tilts strongly toward Madacy, and weighs heavily in the ultimate assessment that there was no triable issue of the likelihood of confusion.

### vi.  Type of Goods and the Degree of Care Likely to Be Exercised by the Purchaser

The type of goods and the degree of care likely to be exercised by the consumer is the sixth *Sleekcraft* factor to be con-

sidered. In this case, M2 Software offers two discrete types of products, each with a distinct group of purchasers.

The first type includes record label and music management administration database programs (including the RLMS and MPMS programs). The primary audience for the record label and music management administration database software products comprises music industry professionals.

The purchasers of the record label and music management databases (and associated services) are highly sophisticated members of the music industry. Regardless of any trademark, they would be well informed about the nature of a database program and its producer before making a purchasing decision. Thus, the possibility that these members of the music industry would be confused about the record label and music management products and services is almost nil.

The second type includes musical works (offered on audio CDs and interactive CD-ROMs, for example). Of the 880 copies of the musical works distributed by M2 Software, 215 CDs at most were purchased by consumers at large. The remaining copies were distributed to various people and not directly sold by M2 Software.

In contrast to those purchasing the record label and music management databases, the purchasers of the musical works (audio CDs, for example) are less sophisticated. Even though more than half of the 880 copies of M2 Software's musical works were distributed to people in the music industry, copies of the musical works were sold to consumers at large. "[E]quity will protect even the uncommonly naive against deception from unfair competition." *Stork Rest., Inc. v. Sahati*, 166 F.2d 348, 358 (9th Cir. 1948). Thus, likelihood of confusion of the casual consumer and the "discerning buyer" must be considered. *Oriental Foods, Inc. v. Chun King Sales, Inc.*, 244 F.2d 909, 915 (9th Cir. 1957).

**[10]** The district court, in performing its *Sleekcraft* analysis, properly considered *both* the general consumers and the music industry members. The district court concluded that the sixth *Sleekcraft* factor weighed in Madacy's favor. This conclusion was not erroneous because M2 Software failed to demonstrate that a reasonable jury could find for M2 Software on the possibility of confusion among the casual consumer; confusion would be even less likely among the discerning music industry members.

### vii.    Defendant's Intent in Selecting the Mark

It is settled that "[a] party claiming trademark infringement need not demonstrate that the alleged infringer intended to deceive consumers." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992). When the alleged infringer knowingly adopts a mark similar to another's, we must presume that the public will be deceived. *See Sleekcraft*, 599 F.2d at 354.

M2 Software presented evidence that Madacy was aware of M2 Software's **M2** mark. Specifically, M2 Software demonstrated that Madacy conducted a trademark search for "record label" uses prior to the launch of its **M2 Entertainment** mark which uncovered M2 Software's **M2** mark. M2 Software claims that this is proof of Madacy's wrongful intent. M2 Software overstates Madacy's ill intentions. In fact, as a result of the search, Madacy's attorney believed that Madacy could "carve out" a non-infringing mark, even with the existence of M2 Software's **M2** mark.

**[11]** The district court ruled that even though Madacy exercised questionable judgment in proceeding with the **M2 Entertainment** mark in the face of the **M2** mark, M2 Software failed to present evidence "that would justify a trier of fact in concluding that [Madacy], with 20 years of experience in the music industry and the ability to produce almost 40,000 CDs in less time than M2 Software could sell 200 CDs, had

any intention of capitalizing on M2 Software's trademark." We agree and hold that the district court did not err in concluding that the seventh *Sleekcraft* "intent" factor also leans towards Madacy's favor.

### viii.    Likelihood of Expansion of the Product Lines

[12] M2 Software claims that because it began to broaden marketing of its "interactive content" on the internet, the eighth *Sleekcraft* factor should weigh in its favor. However, there is a need for "a *strong* possibility of expansion into competing markets" for this factor to "weigh[ ] in favor of a finding of infringement." *E. & J. Gallo*, 967 F.2d at 1293 (emphasis added). M2 Software sold no more than 215 CDs over a ten-year period. This undermines M2 Software's claims that there was a strong possibility of it expanding into competing markets — it was doubtful that M2 Software would expand into general retail distribution of audio CDs. Thus, this *Sleekcraft* factor also favors Madacy.

\* \* \*

[13] To prevail on the ultimate question toward which the *Sleekcraft* analysis is directed — the likelihood of confusion of consumers — M2 Software must show sufficient evidence to permit a rational trier of fact to find that confusion is "probable," not merely "possible." *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir. 1996). M2 Software failed to make such a showing. In sum, Madacy's use of the **M2** mark was not "likely to confuse *an appreciable number* of people as to the source of the product." *Entrepreneur Media, Inc.*, 279 F.3d at 1151 (emphasis added). Therefore, we hold that the district court did not err in its weighing of the *Sleekcraft* factors and in reaching the overall conclusion that M2 Software had failed to raise a triable issue as to a likelihood of confusion.[9]

---

[9]We deny Madacy's request for judicial notice.

## B.  The District Court's Denial of M2 Software's Motion for Reconsideration

We review a district court's denial of a motion for reconsideration for an abuse of discretion. *See Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 883 (9th Cir. 2000).

M2 Software contends that Judge Matz erred in denying its motion for reconsideration of Judge Baird's order granting partial summary judgment in favor of Madacy. According to M2 Software, Judge Baird's order was based on *M2 Software, Inc. v. Viacom, Inc*., which was subsequently reversed in an unpublished decision. M2 Software argues that because our unpublished memorandum disposition reversing *Viacom* constituted new law, Judge Matz should have reconsidered Judge Baird's order granting partial summary judgment in favor of Madacy.

Contrary to M2 Software's contentions, the order granting partial summary judgment against M2 Software relied on the *Viacom* decision only for the narrow proposition that the recognition of M2 Software's trademark in the software field was not likely "to spill over into the musical CD field." Moreover, Judge Baird accepted that there was some *theoretical* relationship between the two fields. M2 Software, however, failed to present evidence to create the inference that there was "an actual *marketing* relationship, one that might be reflected in sales, business opportunities, or recognition." (emphasis in original).

**[14]** Because Judge Baird's reasoning and legal conclusions for granting partial summary judgment in favor of Madacy were supported by other case law, her minimal reliance on the later reversed *Viacom* decision was irrelevant. Thus, Judge Matz properly ruled that the unpublished memorandum disposition for *Viacom* was not binding precedent, *see* Ninth Circuit Rule 36-3(a) (stating that unpublished dispositions of the circuit are not binding precedent except under rel-

evant exceptions), and did not err in denying M2 Software's motion for reconsideration.

### C.   Judgment as a Matter of Law for SFX Entertainment

A district court's grant of a motion for judgment as a matter of law is reviewed *de novo*. *See Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1040 (9th Cir. 2003). "In reviewing a judgment as a matter of law, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.*

Before the case was submitted to the jury, co-defendant SFX Entertainment alleged that it was not directly involved with the trademark infringement. The district court agreed and granted judgment as a matter of law in SFX Entertainment's favor.

**[15]** This ruling was proper. M2 Software did not present any evidence that SFX Entertainment was involved in the production, manufacturing, marketing, sale, or distribution of **M2 Entertainment** products. There was no evidence that SFX Entertainment, the parent company, was liable for the actions of Alphabet City, its subsidiary. The district court therefore did not err in granting SFX Entertainment judgment as a matter of law because a reasonable jury would not find any liability for SFX Entertainment.

### D.   The District Court's Evidentiary Rulings

M2 Software also challenges many of the district court's evidentiary rulings. M2 Software contends that the district court erred by: (1) excluding a likelihood of confusion survey conducted on behalf of M2 Software; (2) excluding evidence of Madacy's common manufacture of allegedly related products; (3) excluding evidence of M2 Software's successful

enforcement of its trademark; and (4) admitting evidence of potential third-party infringers of the **M2** mark.

A district court's evidentiary rulings are reviewed for an abuse of discretion. *See City of Long Beach v. Standard Oil Co.*, 46 F.3d 929, 936 (9th Cir. 1995). Prejudice must be shown to warrant a reversal. *See id.* As explained below, the district court did not abuse its discretion in any of the evidentiary rulings of which M2 Software presently complains.

### i. Exclusion of M2 Software's "Likelihood of Confusion" Survey

Admissibility of a survey is a threshold question that must be resolved by a judge. *See Clicks Billiards*, 251 F.3d at 1263 ("Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge." (internal citations omitted)). Surveys in trademark cases are to be admitted as long as they are "conducted according to accepted principles." *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1982).

M2 Software's survey was twice excluded by the district court because it was not created or conducted in a manner that complied with appropriate standards. The survey was excluded for the first time by Judge Baird when the court granted partial summary judgment against M2 Software. The survey was excluded a second time by Judge Matz when the court ruled on evidentiary matters.

**[16]** Both district judges properly rejected the M2 Software's survey because the survey's creator "did not qualify as an expert on designing or analyzing consumer surveys." Moreover, M2 Software failed to "show that the survey was conducted in accordance with generally accepted survey principles and that the results were used in a statistically correct

manner." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988). M2 Software's arguments regarding the weight of the survey are misplaced because M2 Software first failed to provide a proper foundation for admissibility of its survey. *See Clicks Billiards*, 251 F.3d at 1263 ("Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility."). Thus, the district court did not abuse its discretion in rejecting M2 Software's survey evidence.

### ii. Exclusion of Evidence of M2 Software's Successful Enforcement of Its M2 Trademark

[17] The district court excluded evidence of M2 Software's legal fees in defending its mark against other alleged infringers because such evidence was irrelevant to the case at hand. Moreover, notwithstanding the district court's ruling, M2 Software was still able to elicit some testimony regarding its enforcement efforts at trial. Accordingly, the district court did not abuse its discretion in excluding this evidence, and error, if any, was harmless.

### iii. Admission of Evidence of Similar Marks Other Than Madacy's and Exclusion of Allegedly Related Products

The district court permitted Madacy to present limited evidence of existing third-party marks in the relevant field which were similar to M2 Software's to demonstrate that it was less likely that M2 Software's customers would associate M2 Software's products with those of Madacy's, as opposed to other third parties. The district court, however, did not permit Madacy to introduce non-probative evidence of third-party marks in unrelated fields or of music albums that merely contained an "M2" in the title.

**[18]** Use of similar marks by third-party companies in the relevant industry weakens the mark at issue. *See Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988); *see also Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) ("Evidence of other *unrelated* potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law." (emphasis added)). Therefore, the district court did not abuse its discretion by its evidentiary rulings that related to similar third-party marks.

The district court also restricted M2 Software from introducing evidence of Madacy products that did not bear the **M2** mark because such evidence was not relevant to the *Sleekcraft* likelihood of expansion factor. M2 Software argues that the district court erred because this was evidence of common manufacture of related products which demonstrated a likelihood of expansion. We disagree. The evidence did not have a tendency to show that a likelihood of expansion was more probable than not. *See* Fed. R. Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). In sum, the district court did not abuse its discretion, and error, if any, in excluding the irrelevant evidence was harmless.

### E.     Bifurcation of the Trial on Liability and Damages

The district court's decision to bifurcate a trial is reviewed for an abuse of discretion. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 961 (9th Cir. 2001).

**[19]** In this case, the district court informed the parties and the jury of the possibility that the trial would be bifurcated. The parties did not object. In addition, the district court admonished the jury not to let the trial schedule affect its verdict. The district court bifurcated the proceedings for judicial

economy and to avoid prejudice and confusion. The district court had broad discretion to try the liability phase first and did not abuse its discretion in bifurcating the trial. *See* Fed. R. Civ. P. 42(b) ("The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, . . . or of any separate issue . . . , always preserving inviolate the right of trial by jury . . . .").

## F.    Jury Instructions and Special Verdict Form

A district court's formulation of civil jury instructions is reviewed for an abuse of discretion. *See Monroe v. City of Phoenix*, 248 F.3d 851, 857 (9th Cir. 2001). An error in instructing the jury in a civil case does not require reversal if it is harmless. *See id.* at 860.

It is sad to say that this case "set an all-time record of 276 pages for disputed jury instructions." Even though the parties were of minimal assistance, the district court's jury instructions and special verdict form "fairly and adequately cover-[ed] the issues presented, correctly state[d] the law, and [were] not misleading." *Fikes v. Cleghorn*, 47 F.3d 1011, 1013 (9th Cir. 1995). As discussed below, the district court did not abuse its discretion in formulating jury instructions and the special verdict form.

### i.    Jury    Instructions    Regarding    Likelihood    of Reverse Confusion

M2 Software complains that the district court's jury instructions and special verdict form erroneously suggested that a reverse confusion infringement suit could not be initiated against a junior trademark-holder unless the junior trademark had already saturated the market. M2 Software, in its opening brief, also contends that the district court should have instructed the jury about "potential customers" and "affilia-

tion, connection, and association." These arguments lack merit.

The district court, in jury instruction number 14, defined reverse confusion as occurring when:

    (1)   a senior user of a mark seeks to protect its business identity from being overwhelmed by a larger junior user that has saturated the market with publicity and/or advertising and

    (2)   consumers doing business with the senior user mistakenly believe that they are dealing with the larger junior user.

This jury instruction mirrored the language used in our circuit's reverse confusion cases. *See, e.g., Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897 (9th Cir. 2004) ("The ultimate question in a reverse confusion case is whether consumers doing business with the senior user might mistakenly believe that they are *dealing with* the junior user." (internal quotation marks omitted) (emphasis added)); *Dreamwerks*, 142 F.3d at 1130 (using same "dealing with" language). Moreover, M2 Software's proposed jury instruction included the same language of, and cited to, the *Dreamwerks* case. There was no need for the district court to use the "affiliation, connection, and association" language advanced by M2 Software.

Furthermore, in reverse confusion cases, the inquiry focuses on the strength of a junior mark. The strength of the junior mark is closely related to how much the market is saturated by the junior mark. *See Dreamwerks*, 142 F.3d at 1130 n.5 (stating that because reverse confusion occurs when a senior user loses its goodwill as a result of saturation by a bigger, more powerful junior user's mark, the inquiry focuses on the strength of the junior mark). Thus, the district court's use of "has saturated the market" was harmless.

As to the potential customers to be considered by the jury in determining whether a likelihood of confusion existed, the district court properly and adequately instructed the jury to consider likelihood of confusion among "general consumers." The district court's instructions also properly and explicitly directed the jury to consider the degree of care of "potential buyers."

[20] The district court's instructions clearly covered the reverse confusion issues to be decided by the jury. Therefore, the district court did not abuse its discretion in formulating the jury instructions regarding reverse confusion and any errors were harmless and do not warrant reversal.

### ii.    Jury Instructions Regarding M2 Software's Other Federal, State, and Common-Law Based Claims

To succeed on its other claims, M2 Software must prove a likelihood of confusion. *See Cleary*, 30 F.3d at 1262-63 (stating claims under California Business and Professions Code § 17200 are " 'substantially congruent' to claims made under the Lanham Act"); *Walter*, 210 F.3d at 1111 (stating that false designation under the Lanham Act, as well as the common-law and statutory unfair competition claims, require a showing of likelihood of confusion). The district court properly instructed the jury regarding the elements of likelihood of confusion in a succinct manner. With these instructions, the jury returned a defense verdict finding Madacy not liable. In short, the district court did not abuse its discretion in formulating the jury instructions.

### G.    M2 Software's Request for Attorneys' Fees

[21] Finally, M2 Software argues that attorneys' fees are warranted under the Lanham Act, 15 U.S.C. § 1117. Because M2 Software did not succeed in establishing a violation of its trademark, it is not entitled to attorneys' fees.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's orders granting partial summary judgment in favor of Madacy, granting judgment as a matter of law in favor of SFX Entertainment, and entering final judgment following a jury trial against M2 Software.