**CREDIT ONE CORPORATION**

v.

**CREDIT ONE FINANCIAL, INC., et al.**

**No. CV 09–2985 ODW (SHx).**

United States District Court,
C.D. California.

Sept. 23, 2009.

---

Grant J. Hallstrom, Jayson Lorenzo, Hallstrom Klein & Ward LLP, for Plaintiff.

Susan E. Hollander, Mark S. Lee, Judith M. Schvimmer, Manatt Phelps & Phillips, LLP, for Defendants.

### Proceedings (In Chambers): Order DENYING Plaintiffs' Application for Preliminary Injunction

OTIS D. WRIGHT II, District Judge.

Pending before the Court is Plaintiff's Motion for Preliminary Injunction, filed July 28, 2009. After carefully considering the moving papers, supporting documents and exhibits, and Defendants' Opposition, Plaintiff's application is DENIED for the reasons stated below.

## I. BACKGROUND

Plaintiff Credit One Corporation is a regional auto finance company that purchases retail installment contracts from independently owned and franchised auto dealerships. In February 1996, Plaintiff was incorporated as Credit One. In June 1997, Plaintiff began lending money in Southern California under its "Credit One" mark, the mark in question. Subsequently, Plaintiff formed Credit One, LLC, and Credit One Corporation in California in 1998 and 1999, respectively. In July 2004, Plaintiff opened an office location in Phoenix, Arizona, where it began offering auto finance services. In November 2004, Plaintiff began offering services in North Carolina.

Defendant Credit One Financial is the sole shareholder of Defendant Credit One Bank, N.A. (erroneously sued as "Credit One Bank, N.S."), a national bank that is a leading issuer of VISA credit cards. Defendants began as a full-service bank operating under a different name. In the mid–1990s, Defendants began offering credit card services, which is now their primary focus.

On April 26, 2002, Defendants applied for a federal trademark registration in "Credit One Bank." The U.S. Patent & Trademark Office ("PTO") approved Defendants' application and published the "Credit One Bank" mark on January 7, 2003. On July 25, 2006, the PTO issued federal registration for Defendants' "Credit One Bank" mark.

On May 6, 2004, Defendants applied for trademark registrations for "Credit One" and "Credit One Financial." On October 4 and November 29, 2005, respectively, the PTO published Defendants' "Credit One" and "Credit One Financial" marks for opposition. The PTO granted Defendants' applications for their "Credit One" and "Credit One Financial" marks on October 2, and November 6, 2007, respectively.

To date Defendants have spent over $135 million in marketing under the "Credit One Bank" mark, which was allegedly first used in commerce in November 2005. According to the PTO, Defendants first used their "Credit One Bank" mark in commerce in February 2006 and first used

their "Credit One" mark in commerce in February 2007. To date, Defendants have sent more than 350 million direct mail credit card offers and placed more than 925 online ads using their "Credit One Bank" and "Credit One" marks.

On September 28, 2007, having not previously registered its mark, Plaintiff filed trademark registration for its "Credit One" mark. Upon learning of Plaintiff's application, Defendants sent Plaintiff a cease and desist letter requesting Plaintiff withdraw its trademark registration.

In early 2008, Plaintiff allegedly began receiving a number of calls from unknown consumers asking for Credit One Bank. Between May 2008 and April 2009, Plaintiff has received approximately $8,000.00 in Western Union payments from unknown consumers attempting to send payments for a credit card. In March 2008, Plaintiff was sued in a Los Angeles County small claims court by a gentleman who mistakenly accused Plaintiff of inaccurate reporting on his credit report. On June 1, 2009, Plaintiff received a Better Business Bureau complaint from an unknown consumer in New York, of whom Plaintiff has no records in its database of customers. Plaintiff alleges that these events indicate that consumers are confused between Plaintiff's and Defendants' companies. Thus, Plaintiff filed a complaint against Defendants on April 28, 2009, and on July 28, 2009 filed this Motion for Preliminary Injunction that the Court will now determine.

## II. DISCUSSION

■ To obtain a preliminary injunction, the movant must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.,* —— U.S. ——, 129 S.Ct. 365, 374, 172

L.Ed.2d 249 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, AK,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

### A. Likelihood of Success on the Merits

■ In order to prevail on a Lanham Act false designation claim or a common law trademark infringement claim, a plaintiff must show that it owns a valid mark, that the mark was used without its consent, and that such unauthorized use is likely to cause confusion, mistake, or deception. *See* 15 U.S.C. §§ 1114, 1125; *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1198–1202 (9th Cir.1979) (Lanham Act); *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 192, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999) (common law trademark infringement). "[U]nder the Lanham Act, [ ] the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." *Id.* at 1201.

### 1. Validity of the Mark

■ "Federal registration of a trademark 'constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark' in commerce." *Quiksilver, Inc. v. Kymsta Corp.,* 466 F.3d 749, 755 (9th Cir. 2006) (quoting *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1047 (9th Cir.1999)); *see also Coca–Cola Co. v. Overland, Inc.,* 692 F.2d 1250, 1254 (9th Cir.1982) (noting "[f]ederal registration of a trademark endows it with a strong presumption of validity."). Never-

theless, a party asserting common law trademark rights can "rebut this presumption by showing it used the mark in commerce first." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir.1999). To prevail over a junior user who is an incontestible registrant, a common law senior user must show continuous use prior to the date of the junior user's trademark registration. *Casual Corner Associates, Inc. v. Casual Stores of Nevada, Inc.*, 493 F.2d 709 (9th Cir.1974).

■■■ A party asserting common law rights must not only establish that it is the senior user, it must also show that it has "legally sufficient market penetration" in a certain geographic market to establish those trademark rights. *Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 983 (C.D.Cal.2002). Sufficient market penetration is determined by "examining the trademark user's volume of sales and growth, number of persons buying the trademarked product in relation to the number of potential purchasers, and the amount of advertising" in a given market. *Id.*

Here, Plaintiff asserts that it has been using its Credit One mark in Southern California since June 1997, which it then expanded to Arizona and North Carolina in 2004, making it the senior user in at least these geographic markets. *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.1996) ("in trademark law ... the party claiming ownership must have been the first to actually use the mark in the sale of goods or services"), *cert. denied*, 521 U.S. 1103, 117 S.Ct. 2478, 138 L.Ed.2d 987 (1997). Therefore, Plaintiff has shown it is a senior user in each of these markets, which it entered before Defendants' first trademark was registered in July 25, 2006.

However, while these claims show that Plaintiff is the senior user of the mark in these three states, it is not clear that Plaintiff's market should extend beyond Southern California. *See Glow Industries*, 252 F.Supp.2d at 983 (noting that, although plaintiff is likely to establish itself as the senior user of a mark, it must also demonstrate legally sufficient market penetration "to establish a likelihood of success on the merits"). Plaintiff has only provided revenues for its offices in Southern California and Phoenix, Arizona for the years 2005 and 2006. While this may indicate sales penetration into both markets, Plaintiff has since closed its Phoenix, Arizona office and its 2007 sales reports presumably stem from its Southern California offices only. *See id.* (noting that market penetration is determined by, among other factors, positive and *negative* growth trends) (emphasis added). Given the fact that Plaintiff has closed its Phoenix, Arizona office and has never operated an office in North Carolina, it is unable to assert trademark rights in these areas. *See id.* ("the senior user of a mark is entitled to assert trademark rights in all areas in which it has legally sufficient market penetration").

Plaintiff maintains that it continues to conduct business in both Phoenix, Arizona and North Carolina, and should be entitled to trademark rights in these markets as they are within its zone of natural expansion. Thomas McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 26.20 (4th ed. 2002). To support this contention, Plaintiff has only claimed that it receives payment from customers in both states, maintains business licenses in both states, and asserts that it continues to do business in both states. Because the zone of natural expansion is generally defined narrowly, such evidence is likely insufficient to support such a finding. *See Glow Industries*, 252 F.Supp.2d at 984–86 (finding that sales to consumers in all 50 states, presence of

products in eleven states, nationwide internet availability of its products, and reference of its products in national magazines was insufficient to establish nationwide common law rights).

Therefore, while Plaintiff may be the senior user of the mark in Southern California, Phoenix, Arizona, and North Carolina, its ability to assert valid common law trademark rights is limited and questions remain as to Plaintiff's likelihood of success on the merits of these claims.

### 2. Likelihood of Confusion

■ In order to prevail on a Lanham Act false designation claim or a common law trademark infringement claim, a plaintiff must show the defendant is using its trademarks in such a way as to create a "likelihood of confusion." *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir.2005). The Ninth Circuit has identified a series of factors relevant in an analysis of whether sufficient likelihood of confusion has been established. These factors include: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and, (8) the likelihood of expansion of the product line. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979). In a reverse confusion case, a court should focus on three particular factors: strength of the mark, proximity of the goods, and similarity of the marks. *Dreamwerks Production Group Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998). These factors are not rigid requirements, but rather are helpful guidelines a court should use in its determination. *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir.1990).

■ Here, Plaintiff has not shown a sufficient likelihood of confusion to support a preliminary injunction. Plaintiff's mark has limited commercial and conceptual strength, even within the limited geographic market in which Plaintiff does business. *See Brookfield Commc'ns, Inc. v. W. Coast Entmn't Corp.*, 174 F.3d 1036, 1058 (9th Cir.1999) (describing conceptual distinctiveness and widespread recognition as relevant determinants of a mark's strength). The goods are not proximate either: Plaintiff only offers sub-prime auto loans to auto dealers while Defendants offer credit card services to individuals. Similarly, Plaintiff and Defendants use different marketing channels for their respective products. Plaintiff exclusively offers auto loans directly to auto dealers in a certain region, while Defendants offer credit cards to millions of potential consumers nationally through targeted marketing by direct mail and the internet. Also, because Plaintiff's average loan is $10,000.00, its purchasers are likely to exercise a higher degree of care. (Bozorgi Decl. second ¶ 3); *see Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1152 (9th Cir.2002). Further, there is no indication that Defendant selected its mark with intent to deceive consumers. Similarly, there is no evidence that either party will expand its product line into the other's market. Therefore, using the *Sleekcraft* factors as guidance, this Court determines that Plaintiff has not shown a likelihood of confusion, and thus does not show a likelihood of success on the merits.

Although there is some evidence of actual confusion, these instances are relatively few and far between. Plaintiff's proffered evidence of telephone calls and Western Union payments apparently intended for Defendants are more properly characterized as "misdirected communications" than evidence of actual confusion. *See Checkpoint Systems v. Check Point Software Techs., Inc.*, 269 F.3d 270, 298 (3d Cir. 2001) ("misdirected communications are not evidence of confusion where the sender

knows which party he or she wished to send his communications but erred in the delivery of the message"). The remaining two instances, the dismissed lawsuit and Better Business Bureau complaint, are insufficient to provide strong support for the likelihood of confusion. *See Playboy Enters., Inc. v. Netscape Communications Corp.,* 354 F.3d 1020, 1026 (9th Cir.2004) ("a showing of actual confusion among *significant numbers* of consumers provides strong support for likelihood of confusion") (emphasis added); *Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 902 (9th Cir.2002) ("[i]f enough people have been *actually* confused, then a *likelihood* that people are confused is established"). Therefore, while this factor weighs in Plaintiff's favor, the few examples given are statistically insignificant and therefore do not provide persuasive proof of a likelihood of confusion.

Similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo. com v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000). "[The Ninth Circuit has] developed certain detailed axioms to guide this comparison: first, the marks must be considered in their entirety and as they appear in the marketplace; second, the similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences." *Id.* at 1206 (internal citations omitted). Because similarities are weighed more heavily than differences, this factor also weighs in Plaintiff's favor.

■ Having examined the *Sleekcraft* factors, the Court finds that six of the factors favor Defendants while only two favor Plaintiff. The next inquiry is whether Plaintiff will suffer irreparable harm if a preliminary injunction is not granted. In a trademark infringement claim, "irreparable injury may be presumed from a showing of likelihood of success on the merits." *GoTo.com,* 202 F.3d at 1205 n. 4. The Ninth Circuit has held that this presumption is still reasonable in a post-*Winter* trademark infringement case. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 877 (9th Cir.2009).[1]

### B. Likelihood of Irreparable Harm

Here, because Plaintiff has not shown a likelihood of confusion, a possible presumption of irreparable harm is not applicable. Moreover, Plaintiff has only identified two instances—the dismissed lawsuit and the Better Business Bureau complaint—that could support a likelihood of

---

1. While *Marlyn Nutraceuticals* reaffirms the validity of this presumption, the Ninth Circuit has also recognized that *Winter* overruled its previous burden of possibility of irreparable harm, stating "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *American Trucking Associations, Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir.2009). Accordingly, some district courts have interpreted *Winter* as changing the standard for all preliminary injunctions, and held that irreparable injury is no longer presumed upon showing a likelihood of success on the merits. *See, e.g., CytoSport, Inc. v. Vital Pharmaceuticals, Inc.,* 617 F.Supp.2d 1051, 1065 (E.D.Cal.2009) ("Now, a plaintiff is not granted the presumption of irreparable harm upon a showing of likelihood of success on the merits"); *Volkswagen AG v. Verdier Microbus and Camper, Inc.,* 2009 WL 928130, *2, 2009 U.S. Dist. LEXIS 33708, *6 (N.D.Cal.2009) (same); *cf. Marlyn Nutraceuticals, Inc.,* 571 F.3d at 877 ("[b]ecause the court found a likelihood of success on the merits, it reasonably presumed irreparable injury"); *Moroccanoil, Inc. v. Moroccan Gold, LLC,* 590 F.Supp.2d 1271, 1281 (D.Cal.2008) ("once the plaintiff has established a likelihood of confusion, the court will ordinarily presume 'that the plaintiff will suffer irreparable harm if injunctive relief does not issue'") (quoting *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1220 (9th Cir.1987)). However, since Plaintiff has not shown a likelihood of confusion, the Court need not address this issue.

irreparable harm. These limited instances are too insignificant to establish a likelihood of harm under *Winter*. —— U.S. ——, 129 S.Ct. at 375 (requiring a plaintiff demonstrate that the irreparable harm is significant and a near certainty, not just speculative or potential). In trademark cases, courts have found "irreparable harm in the loss of control of a business' reputation, a loss of trade and loss of goodwill." *CytoSport*, 617 F.Supp.2d at 1080. Defendants have shown that not only has Plaintiff failed to demonstrate a loss of its business' reputation, trade, or goodwill, Plaintiff may not have any goodwill in its mark, as none of the four-hundred potential customers surveyed associated the mark with Plaintiff.

The remaining events of misdirected communication, which occupy some of Plaintiff's resources and possibly require the payment of interest, are monetary damages, which do not support a likelihood of irreparable harm. *See California Pharmacists Association v. Maxwell–Jolly*, 563 F.3d 847 (9th Cir.2009) ("monetary harm does not constitute irreparable harm"). Additionally, and perhaps most telling, Plaintiff's delay in both filing this action and the instant motion demonstrates that a preliminary injunction is not needed. *See E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir.1983). Therefore, given the evidence submitted thus far, Plaintiff has not demonstrated a likelihood of irreparable harm necessary to warrant a preliminary injunction.

## C. Balance of Equities and Public Interest

The Court also notes that the balance of equities and public interest elements both demonstrate that a preliminary injunction would be improper. Plaintiff and Defendants have each spent substantial resources developing their marks, but the hardships Plaintiff may suffer if the status quo is maintained are far inferior to those Defendant would endure if it were required to cease further commercial use of its mark that it had spent years developing. Further, Plaintiff has not shown that a preliminary injunction serves the public interest. Although the public has an interest in the timely payment of its bills, all of Defendants' customers have access to Defendants' correct contact information, and a preliminary injunction or notice is not necessary to rectify this problem. Because Plaintiff has not met any of the elements necessary to obtain a preliminary injunction, Plaintiff's Motion for Preliminary Injunction is DENIED.

## III. CONCLUSION

In sum, Plaintiff has been unable to establish a likelihood of success on the merits—the first element required for a preliminary injunction. Further, Plaintiff has failed to show a likelihood of irreparable harm, that a balance of equities tips in its favor, or that an injunction is in the public interest. Therefore, Plaintiff's motion is hereby DENIED.