**GROUPION, LLC., Plaintiff,**

v.

**GROUPON, INC., et al., Defendants.**

**No. C 11–00870 JSW.**

United States District Court,
N.D. California.

May 8, 2012.

---

## ORDER GRANTING GROUPON'S MOTION FOR SUMMARY JUDGMENT

JEFFREY S. WHITE, District Judge.

■ Now before the Court is the motion for summary judgment filed by Defendant Groupon, Inc. ("Groupon"). Having carefully reviewed the parties' papers, considered their arguments and the relevant legal authority, the Court hereby grants Groupon's motion for summary judgment.[1]

### BACKGROUND

Plaintiff Groupion, LLC. ("Groupion") contends that Groupon is infringing upon its trademark. Groupon is moving for summary judgment on all of Groupion's claims against it. The Court shall refer to additional facts as necessary in the remainder of this Order.

### ANALYSIS

#### A. Applicable Legal Standards.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "In considering a motion

Jedediah Wakefield, Fenwick & West LLP, San Francisco, CA, Charles Webb, Jack Russo, Christopher Joseph Sargent, Clifford Computerlaw Group LLP, Palo Alto, CA, Plaintiff.

Margret Mary Caruso, Attorney at Law, Redwood Shores, CA, for Defendants.

1. The Court DENIES Groupion's request to file supplementary evidence. Groupion fails to show that it could not have obtained a declaration from its expert or evidence regarding Groupon's alleged mobile application earlier.

 With respect to Groupon's administrative motion to seal documents that Groupon marked as confidential, Groupion withdraws its confidentiality designations for all documents referenced in Groupon's motion except for Exhibit 19 to the declaration of Clifford Webb. Groupion also does not request that any redacted portions of Groupon's motion for summary judgment remain under seal. Accordingly, the Court GRANTS Groupon's motion to seal with respect to Exhibit 19 to the Declaration of Clifford Webb and DENIES the remainder of Groupon's motion to seal.

for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505. If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996). In addition, the party seeking to establish a genuine issue of material fact must take care adequately to point a court to the evidence precluding summary judgment because a court is " 'not required to comb the record to find some reason to deny a motion for summary judgment.' " *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pacific Northwest Bell Telephone Co.,* 840 F.2d 1409, 1418 (9th Cir. 1988)). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

## B. Groupon's Motion.

### 1. Groupion's Trademark Infringement and Unfair Competition Claims.

■ To establish trademark infringement under the Lanham Act, Groupion must establish that Groupon is "using a mark confusingly similar to a valid, protectable trademark of [Groupion's]." *Brookfield Communications, Inc. v. West Coast Entertainment,* 174 F.3d 1036, 1046 (9th Cir.1999). At issue is whether Groupion has shown a likelihood of confusion, *i.e.* "whether the similarity of the marks is likely to confuse the customers about the source of the products." *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000) (internal quotations omitted). Groupion bears the burden of proving likelihood of confusion. *See Lindy Pen Co., Inc. v. Bic Pen Corp.,* 725 F.2d 1240, 1243 (9th Cir.1984). "Likelihood of confusion requires that confusion be probable, not simply a possibility." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987); *see also Playboy Enterprises, Inc. v. Terri Welles, Inc.,* 78 F.Supp.2d 1066, 1083 (S.D.Cal.1999) ("There must be a *substantial* likelihood that the public will be confused.") (emphasis in original) (citation omitted), *rev'd in part on other grounds,* 279 F.3d 796 (9th Cir.2002).

■ To determine whether there is a likelihood of confusion between the marks,

the Ninth Circuit applies the following eight factor test: "(1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channel used; (4) the strength of [the plaintiff's] mark; (5) [the defendant's] intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers." *GoTo.Com, Inc.*, 202 F.3d at 1205. However, "the eight-factor test is a pliant one, in which some factors are much more important than others." *Id.*

■ The Court notes that "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir.2002) (citation omitted). Nevertheless, where no material issues of fact are raised reflecting confusion between the marks, summary judgment is appropriate. *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 628 (9th Cir.2005). To defeat Groupon's motion for summary judgment, Groupion must "create a genuine issue that confusion is probable, not simply a possibility." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir.2002) (internal quotation marks and citation omitted).

### i. Similarity of the Marks.

The similarity of the marks is a critical question in this analysis. *GoTo.Com*, 202

F.3d at 1205. "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Id.* at 1206. The Ninth Circuit has developed certain axioms to guide the similarity analysis: (1) "the marks must be considered in their entirety and as they appear in the marketplace;" (2) "similarity is adjudged in terms of appearance, sound, and meaning;" and (3) "similarities are weighed more heavily than differences." *Id.* at 1206 (citations omitted).

■ Despite the similarity in the spelling of the two words, the Court finds that the marks, when viewed in their entirety and as they appear in the marketplace, are dissimilar. Groupion regularly presents its mark in two colors, with the "group" in black and the "ion" in green. (Declaration of Clifford Webb in Support of Groupon's Motion for Summary Judgment ("Webb Decl."), Exs. 4–6, 15.) Only the "G" is capitalized. All of the letters are outlined in white and the mark is on a grey background. The mark is frequently followed by the tag line "Business Groupware and CRM for the Cloud." (*Id.*)[2] In contrast, Groupon's mark is typically all capitalized, all of the letters are in the same white color, the letters are in a thicker font, and the word appears on a black background. (Declaration of Nick Cioffi in Opposition to Groupion's Motion for Preliminary Injunction ("Cioffi Decl."), Exs. 1–3, 13–17.) Moreover, Groupon does not display other marks or words with its mark. (*Id.*) Addi-

**2.** Groupion argues, without citing to any supporting evidence, that its mark is "scattered across the pages of the GROUPION site without the tag line ..." and that "the GROUPION mark appears in the marketplace in context other than the web banner on its site, and frequently on the pages, the company brochure, search return headers and the like alone, without the tag line." (Opp. at 17.) Without any supporting evidence, this attorney argument does not create a genuine issue of a material fact. *See Flaherty v. Warehouse-*

*men, Garage & Service Station Employees' Local Union No. 334*, 574 F.2d 484, 486 n. 2 (9th Cir.1978) (assertions made in complaint, legal memoranda, or oral argument are not evidence and do not create issues of fact). Moreover, even if Groupion had presented some *evidence* regarding the appearance of its mark without this tag line, the irregular absence of the tagline would be insufficient to create a genuine issue of material fact regarding similarity.

tionally, groupion is a three syllable word, while groupon is a two syllable one.[3]

Groupion argues that it is significant that both companies use a similar shade of green on their respective websites where their marks appear. However, a comparison of the two websites reveals that their overall appearance is different. *(Compare* Webb Decl., Ex. 15 *with* Cioffi Decl., Ex. 1.)* Moreover, at issue here is not the appearance of the two websites, but of the companies' respective marks.

Both "groupon" and "groupion" are made up words. However, they were created by different words and, thus, imply different meanings. Groupon was formed by combining the words "group" and "coupon." (Cioffi Decl., ¶ 4.) The United States Patent and Trademark Office ("PTO"), in categorizing the Groupon mark for search purposes, assigned the pseudo mark "group coupon" to the Groupon mark. (Declaration of Jedediah Wakefield in Opposition to Groupion's Motion for Preliminary Injunction ("Wakefield Decl."), Ex. 32.) Groupion states that it was created from the words "groupware" and "companion." (Wakefield Decl., Exs. 1, 2.) The PTO assigned the pseudo mark "group ion," as two words, presumably because it believed Groupion means "group" and "ion." Regardless of which is the accurate meaning of Groupion, neither has the same as the meaning as Groupon.

In opposition to Groupon's motion, Groupion argues that evidence of actual confusion confirms that the marks are similar. (Opp. at 16.) However, Groupion cites to evidence which the Court has already determined does not show any confusion regarding the source of the marks. *See Entrepreneur Media,* 279 F.3d at 1151 ("To constitute trademark infringement,

use of a mark must be likely to confuse an appreciable number of people as to the source of a product."); *Rearden LLC v. Rearden Commerce, Inc.,* 597 F.Supp.2d 1006, 1023 (N.D.Cal.2009) ("The focus is confusion with respect to the source of a product or service.").

Accordingly, even when the evidence is viewed in the light most favorable to Groupion, examining the marks in their entirety, Groupion fails to demonstrate the existence of a genuine issue of material fact regarding the similarity of the marks.

### ii. Relatedness of the Goods or Services.

■ "Related goods are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 n. 10 (9th Cir.1979) (internal quotations omitted). "Related goods are generally more likely than unrelated good to confuse the public as the producers of the goods." *Brookfield,* 174 F.3d at 1055–56 (noting that if the parties did not compete to any extent whatsoever, the likelihood of confusion would probably be remote even though the marks were virtually identical); *see also E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir. 1992) ("Where goods are related or complementary, the danger of consumer confusion is heightened."). To determine whether goods are related, courts may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and whether the goods are similar in use and function. *Sleekcraft,* 599 F.2d at 350. some overlap not significant.

---

**3.** Groupion argues, without any supporting evidence, regarding an unspecified "pre-litigation pronunciation" of its mark. (Opp. at 16.) Attorney argument is not evidence.

Without any *evidence* of a contrary pronunciation, Groupion fails to create a genuine issue of material fact. *See Flaherty,* 574 F.2d at 486 n. 2.

■ Groupion concedes that until late 2011, the services it and Groupon provided did not conflict. (Opp. at 5 ("When GROUPON started its site in November 2008, it offered a service for local businesses to distribute coupons locally, which did not conflict with the already-existing GROUPION mark.").) Instead, Groupion contends that in late 2011 when Groupon launched its "Groupon Rewards" service and "Groupon Scheduler" program, after Groupion filed this lawsuit, the two companies' products then overlapped. (*Id.* at 5–6.)

Groupion describes its product as a "web-based Business Groupware and CRM platform which helps companies and project teams work together and execute different tasks within one integrated working environment." (Declaration of Jedediah Wakefield, Ex. 14; *see also* Mot. at 2 (describing Groupion as "a developer and marketer of Internet web-based Business Groupware and Customer Relations Management (*'CRM'*) SaaS ('software as a service') platforms").) Groupion developed customer relations software to "unify all of the essential functions of small to medium businesses that deal with customer information, including managing marketing campaigns." (Declaration of Peter–Christoph Haider ("Haider Decl."), ¶ 9.) It developed a "software as a service" system "that could be used by merchants to track their customers." (*Id.*, ¶ 6.)

Groupion's software "offers over 100 different functions in 18 easy-to-use modules." (Webb Decl., Ex. 16.) According to Groupion, it "offers numerous functions which assist businesses in structuring, automating and optimising their processes." (*Id.*) Through Groupion's software, businesses "can manage [their] contacts, appointments, tasks, files and e-mails, ... wind up projects and processes, manage [their] central warehouse and generate quotations, delivery notes and invoices

with just a few mouse clicks—across departments and all in one platform." (*Id.*) Groupion provides a long list of the business management functions it offers. (*Id.*, Exs. 6, 16.) Just a few of these functions are: (1) centrally managing contact information, such as capturing complex contact structures; (2) classifying, filtering and searching data; (3) centrally managing business customers, including a "360 degree view of all customer processes"; (4) generating "individual analyses and reports as CSV, XML, PDF or worksheet"; (5) importing and exporting data, including DATEV ASCII data. (*Id.*, Ex. 16.)

In contrast, Groupon is a "'deal of the day' website ... that connects merchants to consumers by offering goods and services at a discount." (Cioffi Decl., ¶ 2.) Groupon utilizes "tipping point" technology. The deals offered are not effective, and customers are not charged, unless the minimum number selected by the merchant purchase the deal. (*Id.*, ¶¶ 3, 5.) Groupon organizes the deals it offers by geography, generally by a specific city. (*Id.*, ¶ 22.) Each of Groupon's websites offers a different featured deal for that location, along with several other less prominent deals every day. (*Id.*) People can access the daily deals by visiting these websites, by signing up with Groupon to receive a daily email, or through a mobile application for smart phones. (*Id.*, ¶¶ 23–25.) Groupon also offers support to merchants offering groupons. Groupon provide merchants advice about offering discounts on Groupon and explain what they can expect in the process. (*Id.*, ¶¶ 31–35.) Despite the numerous functions Groupion's software provides, there is no evidence that Groupion's software creates a market whereby consumers may purchase coupons offered by third parties, similar to what Groupon provides. (Webb Decl., Ex. 12 (Coutu Depo.) at 242:19–22 (stating that Groupion does not promote the goods and services of others on its website).)

Recently, the products Groupon offers to its business customers has expanded to include a rewards program and a calendaring program, and Groupon has improved its merchant center. Groupon describes its new "Groupon Rewards" program as:

a new program allowing consumers to unlock special Groupon deals from their favorite local businesses through repeat visits. Consumers earn rewards at participating merchants simply by paying with the credit card or debit card they have on file at Groupon.com. After spending an amount set by the merchant, the consumer unlocks the ability to purchase a special Groupon for that business.

... [A]s a merchant, Rewards works with your existing [point of sale] system to help you track redemption and [return on investment] while incentivizing future purchases.

(Declaration of Benjamin Coutu in Support of its Opposition to Groupon's Motion ("Coutu Decl."), Ex. 2.) Groupon responded to an inquiry by stating that it's business customers will receive "a report with full names, but no credit card information will be given to the business." (*Id.*) As part of the Groupon Rewards program, Groupon's "in-depth analytics platform shows [its business customers] new and repeat customers, how much [their] customers are spending, how often they visit, and much more." (*Id.*, Ex. 3.)

In December of 2011, Groupon announced its "Groupon Scheduler" program. (*Id.*, Exs. 4, 5.) Groupon describes this program as enabling customers to view

and book appointments and enabling its business customers to "[k]eep track of staff schedules with a tool that understands your services, when you work, and when you are booked" and to "[t]rack customer appointment history and automatically send email reminders to ensure fewer no-shows." (*Id.*)[4]

In early 2012, Groupon announced the launch of its new and improved Merchant Center, which it describes as "a revamped dashboard that gives merchants a comprehensive view of performance across their entire Groupon experience." (*Id.*, Ex. 9.) Groupon states that it "provides demographics information of deal buyers, including age, sex, and zip codes[,]" as well as customer feedback from customers who have purchased Groupons. (*Id.*)[5]

■ Despite the fact that Groupon now provides its business customers some information about the consumers who purchase its products through Groupon, and provides a calendaring program, the Court finds that this small potential overlap of services does not render Groupon's and Groupion's products to be related to the point that consumers would be confused as to their source. *Sleekcraft*, 599 F.2d at 348 n. 10; *see also AutoZone v. Tandy Corp.*, 373 F.3d 786, 798 (6th Cir.2004) (small overlap in products offered in stores was insufficient as a matter of law to show the companies were related). Significantly, Groupon does not provide customer management software which companies may use to "unify all of the essential functions of small to medium businesses that deal with customer information." (Haider Decl. ¶ 9.) A reasonable finder of fact could

---

4. Groupion also submits documents describing the services offered by OpenCal. (Coutu Decl., Exs. 6–8.) Despite the fact that Groupon has now acquired OpenCal, there is no evidence that Groupon is offering all of the services that OpenCal had provided.

5. Groupion also submits declarations from its founders who seek to characterize and further describe what services Groupon's products provide. Groupon objects on the grounds that Groupion's witnesses lack personal knowledge of Groupon's products. The Court sustains these objections.

not find that a business which needs comprehensive customer management software would turn to Groupon because they may obtain some information about their customers who purchase Groupons or because Groupon now offers an online calendar service.[6] Accordingly, the Court finds that Groupion has not demonstrated the existence of a genuine issue of material fact on the relatedness of their goods.

### iii. Marketing Channels Used.

■ " 'Convergent marketing channels increase the likelihood of confusion.' " *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir.1993) (quoting *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir.1987)). While both companies use the internet to advertise and market their goods, the shared used of the internet as a marketing channel is ubiquitous and, thus, does not shed much light on the likelihood of consumer confusion. *See Network Automation v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir.2011) ("Today, it would be the rare commercial retailer that

did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."); *see also Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir.2004) ("Given the broad use of the internet today, the same could be said for countless companies. Thus, this factor merits little weight.")

To the extent the companies market or advertise outside of the internet, their marketing channels differ. Groupion touts its participation at two tradeshows in Germany for CRMs. (Haider Decl., ¶ 23; *see also* Wakefield Decl., Ex. 4.) Groupon did not participate in these events and has not participated in any tradeshows for the business software industry. (Cioffi Decl., ¶ 57.) Moreover, Groupon engages in substantial television, radio, and billboard advertising. (*Id.*, ¶ 55.) Groupion does not. (Wakefield Decl., Ex. 4.) Therefore, Groupion fails to submit any evidence demonstrating that the two companies share similar marketing channels, aside from the ubiquitous use of the internet.[7]

6. Although Groupion now describes one of the functions provided by its software as "coupon management," it admittedly did not start using this term on its website until 2011, after it was aware of Groupon and of the services Groupon provides. Groupion cannot manufacture a likelihood of confusion by expanding into Groupon's business. *See Brookfield*, 174 F.3d at 1051 ("When a senior user of a mark on product line A expands later into product line B and finds an intervening user, priority is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation at the time of the intervening user's appearance."); *see also Machine Head v. Dewey Global Holdings, Inc.*, 2001 U.S. Dist. LEXIS 22759, *12–13 (N.D.Cal. Dec. 13, 2001) (refusing to consider evidence of plaintiff's recent expansion towards the defendant's market because it was not natural at the time of defendant's first use). Here, to the extent that Groupion's "coupon management" services are similar to

Groupon's daily deal offering service, which it is not clear that they are similar, Groupion's expansion into such a service was not natural in 2008 when Groupon was created. Moreover, the "coupon management" is just one of the many functions which Groupion's software provides. (Webb Decl., Exs. 6, 15.) As stated above, some small overlap is insufficient to demonstrate the goods are related. *See AutoZone*, 373 F.3d at 798.

7. Groupion, again without any citation to supporting evidence, argues that because searches on the Google search engine for "Groupion" produce results from "Groupon," the companies share similar marketing channels. This argument does not assist Groupion. In addition to Groupion's fatal failure to cite to supporting evidence, the fact that a third party might suggest an alternative search based on the similarity of the spelling of Groupion and Groupon does not show that the two companies use similar means of marketing their products and services.

### iv. Strength of the Mark.

 "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield,* 174 F.3d at 1058. The Ninth Circuit utilizes a two-prong test to determine the strength of a particular mark. Both the conceptual strength and the commercial strength of a mark are considered. *See GoTo.com,* 202 F.3d at 1207 (" 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength"); *see also Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir. 1988) (approving analysis of mark for distinctiveness as well as strength in the marketplace); *One Indus., LLC v. Jim O'Neil Distrib.,* 578 F.3d 1154, 1164 (9th Cir.2009) ("Identifying whether a mark is generic, descriptive, suggestive, arbitrary or fanciful, however, is only the first step of the inquiry. The second step is to determine the strength of this mark in the marketplace.") (internal quotation marks and citation omitted).

"Conceptual strength involves classification of a mark 'along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.' " *Network Automation,* 638 F.3d at 1149 (quoting *Brookfield,* 174 F.3d at 1058). "The strength of a mark is determined by its placement on a continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful awarded maximum protection." *E. & J. Gallo Winery v. Gallo Cattle,* 967 F.2d 1280, 1291 (9th Cir.1992) (quoting *Nutri/System,* 809 F.2d at 605) (internal quotation marks omitted).

"Commercial strength is based on 'actual marketplace recognition,' and thus 'advertising expenditures can transform a suggestive mark into a strong mark.' " *Network Automation,* 638 F.3d at 1149 (quoting *Brookfield,* 174 F.3d at 1058). "Use of similar marks by third-party companies in the relevant industry weakens the mark at issue." *M2 Software, Inc. v. Madacy Entertainment,* 421 F.3d 1073, 1088 (9th Cir.2005).

 Groupon submits evidence to show that "group" suggests groupware and that "ion" suggests the cloud. (Webb Decl., Exs. 9, 10 (explaining that its name was created, in part, from the word "groupware"); *id.,* Ex. 4; *see also* Wakefield Decl., Ex. 4 (Groupion's response to interrogatory about advertising and promotional activities, stating that Groupion's founders selected its name "to suggest the nature of the computer software that the founders had created, developed, and were already marketing").) Groupion argues both that it chose the name Groupion "to suggest the nature of the CRM software that had been created, developed, and marketed" and that is an invented word with "no dictionary or other apparent meaning or logical relationship between the name of the company and its services." (*Compare* Opp. at 4 *with* Opp. at 20.) However, Groupion does not submit any evidence in support of either argument. Therefore, despite conflicting arguments regarding the mark's conceptual strength, Groupion fails to submit any evidence to show that its mark is conceptually strong.

Moreover, regardless of where Groupion's mark falls on the conceptual spectrum, Groupon submits evidence demonstrating the use of similar marks in the relevant industry as well as the lack of Groupion's commercial strength in the United States, which significantly undermines the strength of its mark. (Wakefield Decl., Exs. 4, 26–28.; Webb Decl., Ex. 12 (Fed.R.Civ.P. 30(b)(6) Deposition of Benjamin Coutu) at 317:8–318:9.) The

only evidence Groupion submits to demonstrate the commercial strength of its mark in the United States is a list of customers in 2007, which includes 45 companies with addresses in the United States. (Haider Decl., Ex. 7.) However, 2007 is before Groupion started using the mark at issue. (Webb Decl., Exs. 9, 10 (announcing name change from i-sense to Groupion).) Therefore, this customer list does nothing to show that Groupion's mark has commercial strength in the United States. Accordingly, Groupion fails to demonstrate a genuine issue of material fact on this factor.

### v. Groupon's Intent in Selecting its Mark.

■■■■ "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides*, 6 F.3d at 1394. Groupion argues vigorously that Groupon "*must* have intentionally selected the confusingly similar trade-name." (Mot. at 19) (emphasis in original.) However, in addressing Groupion's motion for preliminary injunction, the Court noted that Groupion did not submit any evidence to show that Groupon actually knew of Groupion when it selected its mark. Additionally, the Court found that Groupon submitted an affirmative declaration stating that no one at Groupon had heard of Groupion when they selected the mark. (Order at 8 (citing Cioffi Decl., ¶ 4).) In its opening motion, Groupon cites to evidence in support of its position that no one at Groupon had heard of Groupion when they chose its name. (Cioffi Decl., ¶ 4.) In opposition to Groupon's motion, Groupion again fails to cite to any evidence in support of its argument regarding intent. Accordingly, the Court finds that Groupion fails to show the existence of a genuine issue of material fact as to Groupon's intent in selecting its mark.

### vi. Evidence of Actual Confusion.

■■■■■ "Evidence of actual confusion by consumers is strong evidence of likelihood of confusion." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 633 (9th Cir.2005). However, the absence of evidence of actual confusion is generally unnoteworthy because actual confusion is hard to prove. *Brookfield*, 174 F.3d at 1050. "The focus is confusion with respect to the source of a product or service." *Rearden LLC v. Rearden Commerce, Inc.*, 597 F.Supp.2d 1006, 1023 (N.D.Cal.2009); *see also Entrepreneur Media*, 279 F.3d at 1151 ("To constitute trademark infringement, use of a mark must be likely to confuse an appreciable number of people as to the source of a product."). Upon review of the evidence Groupion submitted in support of its motion for preliminary injunction, the Court found that none of it demonstrated instances of actual confusion by its customers regarding the source of its products. In opposition to Groupon's motion, Groupion cites to the same evidence the Court already found did not show actual confusion by its customers regarding the source of its products. In fact, in the customer email Groupion relies on, the customer states although he found some confusing entries on a Google search for Groupion's products which referenced Groupon, the "sites were obviously referring to groupon.com, and had nothing to do with the Groupion software." (Haider Decl., Ex. 32.) This customer was not confused regarding the source of Groupion's or Groupon's products. Accordingly, the Court finds that Groupion fails to demonstrate the existence of a genuine issue of material fact regarding actual customer confusion.

### vii. Likelihood of Expansion into Other Markets.

"Inasmuch as a trademark owner is afforded greater protection against compet-

ing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (internal quotations omitted). Groupion argues that it demonstrated that Groupon "is already moving into the field of [customer relationship management] software and services for its merchants and clientele." (Opp. at 22.) However, Groupion cites to paragraphs from the declaration of Benjamin Coutu to which the Court has sustained Groupon's objections. Moreover, the Court notes that what is relevant is the substance of the two companies' respective products and services, not the characterizations or labels offered by the parties regarding the products and services. As stated above, the Court examined the admissible evidence regarding Groupon's products and services and found that a reasonable juror could not find that a business which needs comprehensive customer management software would turn to Groupon. Accordingly, the Groupion fails to demonstrate the existence of a genuine issue of material fact regarding the likelihood of expansion.

### viii. Degree of Care Likely to be Exercised by Purchasers.

In determining likelihood of confusion, courts also consider the nature of the goods and the type of consumer. *Network Automation*, 638 F.3d at 1152. "Low consumer care ... increases the likelihood of confusion." *Id.* (internal citation omitted). The default standard used by courts is "the typical buyer exercising ordinary caution." *Id.* However, when the buyers have expertise in the field, courts apply a higher standard. *Id.* Consumers of business software, such as Groupion's customers, generally exercise a higher degree of care than a typical consumer. *Id.*

When ruling on Groupion's motion for preliminary injunction, the Court noted that Groupion had conceded that customers who are seeking and evaluating software for use in their business will likely use more care than ordinary consumers. In opposing Groupon's motion for summary judgment, Groupion does not dispute, or even address, its prior concession. Groupon now cites to additional evidence in support of its position. Groupion describes itself as a "web-based Business Groupware and CRM platform." (Webb Decl., Ex. 16.) Groupion states that the software it offers "helps businesses and project teams implement the full range of interdivisional and enterprise-wide functions and processes with one integrated platform.... Groupion assures the flexible integration of existing applications within a heterogenous application landscape in accordance with the principles of service-orientated architecture." (*Id.*) Its software "offers numerous functions which assist businesses in structuring, automating and optimising their processes." (*Id.*) A few of these functions are: (1) centrally managing contact information, such as capturing complex contact structures; (2) classifying, filtering and searching data; (3) centrally managing business customers, including a "360 degree view of all customer processes"; (4) generating "individual analyses and reports as CSV, XML, PDF or worksheet"; (5) importing and exporting data, including DATEV ASCII data. (*Id.*) Groupion goes on to describe numerous additional functions its software provides. (*Id.*) Upon review of Groupion's description of its software, the Court finds that it is targeted towards sophisticated business customers. Again, Groupion fails to offer any evidence in opposition to Groupon motion. Instead, Groupion merely argues that its customers "are *not necessarily* sophisticated with online sales and methods." Such argument is insufficient to create a genuine issue of material fact. *See Flaherty*, 574 F.2d at 486 n. 2.

Groupon submits evidence demonstrating that its potential business customers— merchants who might seek to offer group discounts through Groupon—would also likely to exercise care in making such purchasing decisions. (Cioffi Decl., ¶¶ 35, 36.). The decision to use Groupon typically involves, *inter alia,* deciding on an amount of a discount, what exactly it will and will not cover, the number of Groupons to offer and what restrictions should apply. (*Id.* at ¶ 36.) Groupion does not address the level of care used by Groupon's business customers. Accordingly, Groupion fails to demonstrate the existence of a genuine issue of material fact regarding the level of care likely to be exercised by customers.

### ix. Overall Analysis of *Sleekcraft* Factors.

The Court finds that, when viewing the evidence in the light most favorable to Groupion, upon balancing the *Sleekcraft* factors, no reasonable juror could find that Groupon is using a confusingly similar mark. *See Surfvivor Media,* 406 F.3d at 628 (granting summary judgment where "no material issue of fact was raised reflecting confusion between the marks). Accordingly, the Court grants Groupon's motion for summary judgment on Groupion's claims for trademark infringement and unfair competition."

### 2. Groupion's Claim for Cancellation.

■ Groupon moves for summary judgment on Groupion's claim for cancellation of Groupon's trademark registration. Groupions cancellation claim is premised on two basis. Groupon moves for summary judgment on the grounds that Groupion's first theory, cancellation based on likelihood of confusion, fails because there is no likelihood of confusion between the parties marks. Groupon also moves on the grounds that Groupion's second theory, fraud on the PTO, is untenable based on the facts in the record. "Fraud in procuring a mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *Quiksilver, Inc. v. Kymsta Corp.* 466 F.3d 749, 755 (9th Cir.2006) (quoting *L.D. Kichler Co. v. Davoil, Inc.,* 192 F.3d 1349, 1351 (Fed.Cir.1999)). Groupon submits evidence demonstrating that it did not misrepresent its first use in commerce or conceal the existence of Groupion or its mark to the PTO. (Cioffi Decl., ¶¶ 4, 7–14, Exs. 9, 11.) Groupion fails to address Groupon's motion on this ground and, thus, fails to submit any evidence to create a genuine issue of material fact necessary to survive summary judgment. Accordingly, the Court grants Groupon's motion for summary judgment against Groupion's cancellation claim.

### 3. Monetary Recovery.

■ Groupon moves for summary judgment against Groupion on its claims on the alternative grounds that Groupion cannot recover any money from Groupon. To recover profits from a defendant, the Ninth Circuit requires a showing of willful infringement. *See Lindy Pen Co., Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1406 (9th Cir.1993). Furthermore, "[w]illfulness and bad faith 'require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense.' " *Id.* (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 966 (D.C.Cir.1990)). As discussed above, Groupon submits evidence demonstrating that no one at Groupon had heard of Groupion when they selected its mark. (Cioffi Decl., ¶ 4). Groupion does not submit any evidence to the contrary.

Instead, Groupion argues vigorously that Groupon has "*repeatedly* asserted blatant falsehoods" and, thus, a reasonable trier of fact "considering this impeachment

can properly infer that [Groupon] misrepresented the facts at the time it opposed Plaintiff's motion for summary judgment and did so *knowingly* to preclude an adverse ruling on its own intentional (and continuing) infringement of [Groupion's] rights." (Opp. at 22–23) (emphasis in original.) According to Groupion, Groupon misrepresented its plans and intentions regarding is products. (Opp. at 23.) In support of this assertion, Groupion cites to several paragraphs from Benjamin Coutu's declaration. However, the Court has already sustained Groupon's objections to these paragraphs in which Mr. Coutu seeks to characterize and describe Groupon's products. The Court has already determined, based on the on the admissible evidence that, to the extent there may be some small overlap between the services of Groupon and Groupion, their products are not related. Importantly, consumers would not be confused as to the source of the products.

In Mr. Coutu's declaration, he also states that the statement made by Nick Cioffi, Groupon's Vice President of Global Operations, that "[n]o personal information about an individual purchaser is provided," (Cioffi Decl., ¶ 50), is contradicted by Groupon's latest products announced in late 2011. (Coutu Decl., ¶ 5.) However, Mr. Cioffi signed this declaration on August 29, 2011. At that time, "none of the new features highlighted in [Groupion's] Opposition—Groupon Rewards, Groupon Scheduler, or the enhanced Merchant Center—existed." (Declaration of Nick Cioffi in Support of Groupon's Reply, ¶ 4.) Therefore, Groupion has not demonstrated that Groupion has made any misrepresentations to the Court. More importantly, Groupion has not submitted any evidence which evinces willful infringement of Groupion's mark—a connection between a Groupon's awareness of Groupion and Groupon's actions at Groupion's expense. Accordingly, Groupion fails to demonstrate

the existence of a genuine issue of material fact to defeat summary judgment on its request for Groupon's profits.

■ Additionally, Groupon argues that Groupion cannot prove any actual damages. To recover damages, "[a] plaintiff must prove both the fact and the amount of damage." *Lindy Pen*, 982 F.2d at 1407. Groupon cites to evidence in support of its argument that Groupion has no evidence of any actual damages incurred. (Webb Decl., Exs. 12, 13, 19.) Groupion does not counter with any evidence, or even argument. Accordingly, the Court grants Groupon's motion for summary judgment on Groupion's request for actual damages.

■ With respect to Groupion's claim for unfair competition, Groupion does not specify whether this claim is brought under California's Unfair Competition Law ("UCL") or under common law. Either way, Groupon argues, and Groupion does not counter either with argument or evidence, that Groupion cannot obtain any monetary recovery. Under the UCL, monetary recovery is limited to restitution. Under California's UCL, a plaintiff is limited to injunctive relief and restitution. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144, 131 Cal. Rptr.2d 29, 63 P.3d 937 (2003). An order for "restitution" is an order that compels a "defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Id.* at 1144–45, 131 Cal.Rptr.2d 29, 63 P.3d 937 (quoting *Kraus v. Trinity Management Services, Inc.*, 23 Cal.4th 116, 126–27, 96 Cal.Rptr.2d 485, 999 P.2d 718 (2000)); *see also Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000) (goal of restitution is to restore

plaintiff to *status quo ante* ). Disgorgement of profits is allowed under the UCL only to the extent it constitutes restitution, *i.e.*, profits unfairly obtained to the extent they represent money in which the plaintiff has an ownership interest. *Id.* at 1145, 1148, 131 Cal.Rptr.2d 29, 63 P.3d 937; *see also Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 699, 38 Cal.Rptr.3d 36 (2006) (a plaintiff can seek money or property as restitution where such "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession") (citation omitted). Groupion has not submitted any evidence, or even argument, to show that Groupon obtained money from Groupion or that Groupion otherwise has an ownership interest of any of Groupon's profits.

■■■ Under California law, unfair competition is limited to cases in which a party passes off their goods as another. *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir.2008); *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1263, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). Groupion has not alleged that, and does not argue that it could have, Groupon passed off its goods as those of Groupion's.

■■■ Finally, Groupon argues that Groupion cannot recover punitive damages or statutory damages as a matter of law. Punitive damages are not recoverable under the Lanham Act or under California's

UCL. *See Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir.1996); *Turnbull & Turnbull v. ARA Transp., Inc.*, 219 Cal. App.3d 811, 826–27, 268 Cal.Rptr. 856 (1990); *see also In re Wal–Mart Stores, Inc.*, 505 F.Supp.2d 609, 620 (N.D.Cal. 2007). Although under some circumstances, punitive damages may be recoverable under a California common law claim, in California common law unfair competition claims are limited to cases in which a party passes off their goods as another. As discussed above, Groupion did not bring such a claim. Under the Lanham Act, statutory damages are only available for claims of counterfeiting and cybersquatting, *see* 15 U.S.C. § 1117, neither of which are at issue here. Groupion does not dispute that it cannot recover punitive or statutory damages. Accordingly, the Court grants Groupon's motion with respect to Groupion's request for any form of monetary recovery.[8]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Groupon's motion for summary judgment.

**IT IS SO ORDERED.**

---

**8.** At the end of Groupion's opposition brief, it improperly requests that the Court reconsider its order denying Groupion's motion for summary judgment. Groupion did not file a motion for leave to file a motion for reconsideration and, therefore, its request is procedurally improper. *See* N.D. Civ. L.R. 7–9(a). Moreover, a motion for reconsideration may be made on one of three grounds: (1) a material difference in fact or law exists from that which was presented to the Court, which, in the exercise of reasonable diligence, the party

applying for reconsideration did not know at the time of the order; (2) the emergence of new material facts or a change of law; or (3) a manifest failure by the Court to consider material facts or dispositive legal arguments presented before entry of the order. Civ. L.R. 7–9(b)(1)(3). Groupion fails to present any new facts or change of law or any failure of the Court to consider material facts or dispositive legal arguments presented. Therefore, Groupion's request is substantively defective as well.